**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **BRIAN K. ALFARO,** | § | |
| **ALFARO OIL & GAS, LLC, and** | § | |
| **ALFARO ENERGY, LLC,** | § | |
| | § | |
| **Appellants,** | § | **Civil Action No.: 5-18-cv-00329-OLG** |
| | § | **On Appeal from Bankruptcy Court** |
| **vs.** | § | **Adversary No. 15-05047** |
| | § | |
| | § | |
| **RICK REILEY,** | § | |
| **BETTY REILEY,** | § | |
| **VINCENT GILLETTE,** | § | |
| **SHARON WALLS,** | § | |
| **RICK GRIFFEY,** | § | |
| **THOMAS GILLETTE,** | § | |
| **DC OIL COMPANY,** | § | |
| **JAMES BUFORD SALMON, and** | § | |
| **DAVID DAVALOS,** | § | |
| | § | |
| *Appellees.* | § | |

# APPELLANTS' BRIEF

Respectfully Submitted:

James A. Pikl
Patrick J. Schurr
SCHEEF & STONE, LLP
2600 Network Blvd., Suite 400
Frisco, Texas 75034

**Attorneys for Appellants**

## Corporate Disclosure Statement – FRAP 26.1

### Appellants

Alfaro Oil & Gas, LLC
Alfaro Energy, LLC

Neither Appellant has any parent corporation, nor is either owned more than 10% by a publicly held corporation.

### Appellees

D.C. Oil Company

Appellants are unaware of the ownership status of this Appellee.

All other parties are private individuals.

# Table of Contents

Corporate Disclosure Statement.................................................... 2

Table of Authorities ..................................................................... 5

Jurisdictional Statement............................................................... 8

Statement of Issues Presented for Review ................................... 8

Statement of Facts........................................................................ 9

Summary of Argument................................................................15

Argument ....................................................................................21

Standard of Review ....................................................................21

    I. There was no evidence or insufficient evidence to
      support a finding of fraud, and hence all causes of
      action dependent on that finding are not supported
      in the evidence ..................................................................22

    II. There is no evidence that any "commissions" were
       paid to Primera employees or that funds were ever
       used other than exactly as represented.........................36

        A. Raw timing of salaries is not supportive of a
          "commission" salary arrangement ............................37

        B. The evidence all shows Primera used investor
          funds exactly as represented .....................................40

        C. Even if statements or promises exist in the PPMs
          that Primera or AOG did not fulfill, that would
          only be actionable as a breach of contract under
          Texas law, not fraud, and Appellees chose not to
          bring a breach of contract claim ...............................41

III. The bankruptcy court erred when it found a violation of the Texas Uniform Fraudulent Transfer Act because Appellees did not prove the prima facie elements needed to support that finding.........................................42

Conclusion and Prayer...............................................................................47

Certificate of Compliance .........................................................................48

Certificate of Service.................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**U.S. Supreme Court Cases**

*Erie Railroad Co. v. Tompkins*,
    304 U.S. 64 (1938)...........................................................................................21

**U.S. Bankruptcy Court Cases**

*In re McCollum*,
    363 B.R. 789 (E.D. La. 2007) ........................................................................21

**Other Federal Cases**

*In re Babcock & Wilcox Co.*,
    526 F.3d 824 (5th Cir. 2008) .........................................................................21

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) .........................................................................22

**WestLaw Cases**

*ConocoPhillips Co. v. Koopman*,
    2016 WL 2967689 (Tex.App.—Corpus Christi 2016, no pet.)........................42

*Henderson v. Wal-Mart Stores, Inc.*,
    2015 WL 970673 (E.D. Tex. 2015).................................................................40

*Hoffman v. AmericaHomekey, Inc.*,
    2015 WL 12698389 (N.D. Tex. 2015) ............................................................43

*Metropolitan Life Ins. Co. v. Haden & Co.*,
    158 F.3d 584, 1998 WL 648603 (5th Cir. 1998)..............................................24

*Total E & P USA, Inc. v. Mo-Vac Service Co., Inc.*,
    2012 WL 3612505 (Tex.App.—Corpus Christi 2012)......................................41

**Other State and Local Cases**

*Crawford v. Ace Sign, Inc.*,
    917 S.W.2d 12 (Tex.1996).............................................................................41

*D.R.C. Parts and Accessories, LLC v. VM Motori, S.P.A,*
   112 S.W.3d 854 (Tex.App.—Houston [1st Dist.] 2003, rev.
   denied)(*en banc*) ................................................................................24

*D.S.A., Inc. v. Hillsboro ISD,*
   973 S.W.2d 662 (Tex.1998).................................................................36, 41

*EP Operating Co. v. MJC Energy Co.,*
   883 S.W.2d 263 (Tex.App.–Corpus Christi 1994, writ denied)........................24

*Ford Motor Co. v. Ridgway,*
   135 S.W.3d 598 (Tex.2004)..................................................................40

*Forest Oil Corp. v. McAllen,*
   268 S.W.3d 51 (Tex.2008)...................................................................32

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,*
   960 S.W.2d 41 (Tex.1998)...................................................................41

*Haase v. Glazner,*
   62 S.W.3d 795 (Tex.2001)...................................................................23

*Italian Cowboy Partners v. Prudential Ins.,*
   341 S.W.3d 323 (Tex.2011)..................................................................28

*Janvey v. Golf Channel, Inc.,*
   487 S.W.3d 560 (Tex.2016)..................................................................42

*Lake v. Cravens,*
   488 S.W.3d 867 (Tex.App.—Fort Worth 2016, pet. pending)...........................27

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,*
   991 S.W.2d 787 (Tex.1999)..................................................................35

*Miller Global Props, LLC v. Marriot Int'l, Inc.,*
   418 S.W.3d 342 (Tex.App.—Dallas 2013, rev. denied) ...........................23, 24

*Plano Surgery Center. v. New You Weight Mgmt. Ctr.,*
   265 S.W.3d 496 (Tex.App.—Dallas 2008, no pet.) ...........................36

*SW Bell Tele. Co. v. DeLanney,*
   809 S.W.2d 493 (Tex.1991)..................................................................41

*Worldwide Asset Purchasing, LLC v. Rent-A-Center East, Inc.*,
    290 S.W.3d 554 (Tex.App.—Dallas 2009, no pet) ............................................30

*Zorrilla v. Aypco Constr. II, LLC*,
    469 S.W.3d 143 (Tex.2015)...............................................................................23

**Statutes**

28 U.S.C. §158(a)(1)...........................................................................................8

Tex. Bus. & Com. Code Ann. Chapters 26 and 27..................................................24

Tex. Bus. & Com. Code Ann. §24.001...............................................................42, 43

Tex. Bus. & Com. Code Ann. §24.002(3) and (4)....................................................43

Tex. Bus. & Com. Code Ann. §24.008....................................................................43

Tex. Bus. & Com. Code Ann. §26.01......................................................................25

Tex. Bus. & Com. Code Ann. §26.01(b)(4) ............................................................25

**Other Authorities**

Fed. R. Bankr. P. 8002(a) and (b) ...........................................................................8

Fed. R. Bankr. P. 8003 ...........................................................................................8

## Jurisdictional Statement

This appeal is filed in accordance with Federal Rule of Bankruptcy Procedure 8003.

The District Court has jurisdiction over this appeal in accordance with 28 U.S.C. §158(a)(1).

This appeal is timely in accordance with Federal Rule of Bankruptcy Procedure 8002(a) and (b) in that the final order of the Bankruptcy Court, following its ruling on motions to amend, was entered on March 29, 2018, and notice of appeal was timely filed within 14 days of that ruling on April 11, 2018.

This appeal is from the final judgment of the United States Bankruptcy Court, Western District of Texas, San Antonio Division.

## Statement of Issues Presented for Review

A. There was no evidence or insufficient evidence to support judgment for fraud, fraud in the inducement, fraud in a real estate transaction, or negligent misrepresentation, so the bankruptcy court should have issued a take-nothing judgment on those claims.

B. The bankruptcy court erred in finding that Primera paid its employees using a commission-based compensation structure because there was no evidence or insufficient evidence in support of that finding, and the overwhelming weight of the evidence proved that no such commissions were ever paid.

C. The bankruptcy court erred when it found justified reliance in support of fraud findings when there was no evidence or insufficient evidence to support those findings, and no such reliance can be established here as a matter of law.

D. The bankruptcy court erred when it found materiality of representations made to Appellees when there was no evidence or

insufficient evidence to support that finding, and no such finding can be established here as a matter of Texas law.

E. The bankruptcy court erred when it made fraudulent transfer findings because Appellees did not prove any of the prima facie elements in support of that finding.

## Abbreviations

The following abbreviations are used in this Brief:

| | |
|---|---|
| Primera | Primera Energy, LLC |
| AOG | Alfaro Oil & Gas, LLC |
| Alfaro Energy | Alfaro Energy, LLC |
| Alfaro | Brian Alfaro, individually |
| PPM | Private Placement Memorandum |
| TR | Reporter's transcript of the trial on <u>mmddyy</u> |
| DX | Defendants' trial exhibit |
| PX | Plaintiffs' trial exhibit |

## Statement of Facts

Some of the following facts are not evidentiary or are not disputed and are included here for context. Record evidence of facts is cited when there is any question about their proof; record pinpoints are in the footnotes. Appellants do not cite the record locations where every instance of every fact is found.

Also, the majority of Appellants' contentions relate to the ***absence*** of evidence in the record. Obviously, there is no way to cite to the record for the absence of evidence.

1. Appellees are working interest owners in various oil and gas wells that were promoted and sold by Primera and AOG.[1]

2. Each Appellee is an "Accredited Investor," meaning they reported to Primera and AOG, before investing, that they had a minimum net worth or minimum level of income making them financially suitable to invest in the wells. But for those representations, among others, Appellees would not have been able to purchase any working interests offered by Primera and AOG.[2]

3. Each Appellee was provided with a Confidential PPM describing in detail each investment/well they were considering participating in ***before*** they invested.

4. For each investment, each Appellee signed a Subscription Agreement in which they made representations about their

---

[1] The seller of the Montague Legacy 1H and 2H (partial) wells was AOG. This entity changed its name to "Alfaro Energy, LLC" in April 2010, but for purposes of this case, we will continue to refer to it as AOG for consistency with the underlying documents. Primera sold the other interests at issue here.

[2] See, e.g., TR 041117, p. 12 (Vince Gillette); 041217, pp. 253-54 (Rick Griffey); 041217, pp.152-53 (Brian Hubler).

financial wherewithal, their status as accredited investors, and expressly agreed to be bound by terms of the related PPM.

5.   Importantly, the Subscription Agreements all contained, *inter alia*, representations by Appellees that if false, would have kept Appellees from becoming investors, including:

    a.   they were not relying on any information, either written or verbal, other than the information contained in the PPMs, in making their decisions to invest (DX 4, p. 6241, ¶f);

    b.   any projections made by Primera or AOG in the PPMs were "merely estimates of possible results and not predictions of actual results," and investors agreed they would not rely on any such estimates or projections in making their investment decisions (DX 4, p. 6241, ¶h);[3]

    c.   investors had the opportunity to ask any questions they might have had prior to investing (DX 4, p. 6240, ¶e);[4] and

    d.   investors were fully aware of the high degree of risk in the investments whereby they might lose their entire investment and receive no return (DX 4, p. 6240, ¶f).[5]

6.   Each well had its own separate PPM that included an Authority for Expenditures or "AFE" setting forth the estimated cost to

---

[3]    Estimates or projections only: TR 041017, p. 116; 041217, pp. 11, 25, 19-20, 51-52, 92, 113.

[4]    Every Appellee who said they asked any questions testified that Primera personnel answered all of their questions to their satisfaction, and no Appellee testified that the answers they received were incorrect. See, e.g., TR 041017, pp. 208-09 (David Davalos); TR 041117, pp. 46-47 (Rick Reiley); TR 041217, pp. 142, 145-46 (Hubler); pp. 181, 184-85 (Walls); p. 324 (Tom Gillette).

[5]    All Subscription Agreements contain similar or identical language to DX4 (2H). See, e.g., PX 73 (1H), p. 9629; DX106 (3H), p. 7667; DX 109 (4H), p. 7783, DX 15 (6H), P. 6358;  DX 33 (Buda), p. 6532.

drill and complete that well. This cost estimate we refer to herein as the well's "budget."

7.  Investors all agreed that if the incurred costs to drill and complete the well were less than the budget, the extra monies in the budget not spent on such costs would become the property of Primera.[6]

8.  The PPMs all provided that if the operator experienced any unanticipated events while drilling or completing the well, investors would be responsible for paying their pro rata share of any extraordinary expenses necessary to drill or complete it. That is, the budget for each well was only for the anticipated and estimated maximum costs for ordinary drilling and completion, not for extraordinary – and thus impossible to estimate – costs that might be incurred from unanticipated events.

9.  Once the wells were drilled and completed on budget, investors agreed to be responsible for their pro rata share of all post-completion costs, which are usually called "Lease Operating Expenses" or LOEs. Likewise, investors were entitled to receive

---

[6] See, e.g., TR 041717, p. 215-16; record citations in fn 2, *supra*.

their pro rata share of any net revenues obtained from production and sale of oil and gas from their wells, and any tax benefits from their investments. LOEs are not part of the budget in the PPMs; the budget is only for anticipated costs up to completion.

10. Most of the wells (Montague Legacy 1H, 2H, Screaming Eagle 1H, 2H, 3H, and 4H; there was no Screaming Eagle 5H well) were drilled and completed, on or under budget.[7]

11. The Screaming Eagle 3H well experienced post-completion collar and casing failures[8] that well investors were contractually required to pay to have repaired. However, the failures were likely attributed to the negligence of the casing company, Tejas Tubular, and Primera filed a lawsuit against Tejas Tubular to recover these costs; that lawsuit is still pending.[9]

12. Screaming Eagle 6H was drilled but not fracked and completed.[10] Appellees presented no evidence as to why this well was not fracked. In fact, the 6H well was not completed because it was

---

[7]     See TR 041017, pp. 81-82 (3H and 4H), 103 (6H); 171-72 (all but 6H and Buda); TR 041117, p. 130 (2H). In addition, the fact that all the wells except Buda were drilled does not appear to be contested in this case. TR 041017, p. 83 (Mr. Barchus).

[8]     The collar and casing failures do not appear to be contested facts. TR 041017, pp. 41-42.

[9]     TR 041017, pp. 234-35; TR 041217, pp. 318-19.

[10]     TR 041217, pp. 235-36.

discovered, post-drilling, that the engineer, Brennan Short, had mis-located the well bore over the hard line for the well lease, and no production was therefore allowed from that well until the well bore was moved and correctly placed.[11] Primera has filed a lawsuit against Brennan Short to recover its expenses in moving the 6H well bore.[12] Investors in 6H have not paid the cost to move the 6H well bore, and the state-court lawsuit and bankruptcy filing prevented Primera from seeking those funds and getting the well bore correctly situated.[13]

13. Blackhawk Buda was a fairly new project at the time the state-court lawsuit was filed. It was not drilled or completed because over half of the subscriptions had not been paid at the time Appellees' state-court lawsuit was filed, which suit prevented Primera from obtaining the rest of the funds necessary to drill and complete it.[14]

14. Primera is also the defendant in several lawsuits filed by vendor companies that provided mostly post-completion work on the

---

[11]     TR 041017, p. 46, TR 041717, p. 64.
[12]     TR 041017, p. 46.
[13]     Id. Now, since all of these wells have been sold by Primera's bankruptcy trustee, no further expenses or activities by the parties herein are anticipated.
[14]     TR 041017, p. 46.

various wells. Primera claims that none of those lawsuits are meritorious. Whether meritorious or not, there is no proof that any of the lawsuits filed by vendor companies against Primera had any impact whatsoever on the drilling, operation, or production of oil or gas from the subject wells, or increased in any way Plaintiffs' costs to drill or complete the wells.[15]

15. Monies paid to Primera employees over the three-year period in question were paid in about 1,100 installments, and of those installments only around 80 of them were equal to plus/minus 10% of the amount of investor funds deposited at or near the time the salaries or bonuses were paid to Primera employees.

### Summary of Argument

Appellees mainly complain in this lawsuit that Primera and AOG, and in particular Brian Alfaro as agent for Primera and AOG, told them:

> (1) Primera and AOG were not going to pay transaction-based compensation (i.e., percentage commissions) to their salesmen, and

---

[15]     When vendor companies file lawsuits, or even file liens on the properties, that does not prevent or stop production, it only creates a possible liability to pay the charges the vendor companies claim are owing provided, of course, that the vendor's claims prove to be valid. Obviously, invalid claims impose no obligation to pay them; that is what it means to be "invalid."

(2) all money Appellees invested would be used to drill and complete the subject oil and gas wells.

Appellees also complain that:

(3) Brian Alfaro was "overpaid" by Primera and thus was able to live an extravagant lifestyle allegedly using "their money," contrary to alleged promises otherwise, and

(4) Mr. Alfaro, AOG, and Alfaro Energy fraudulently transferred "investor monies" to third parties.

As shown below, Appellees' complaints (1) and (2) are belied by express language in the controlling Private Placement Memoranda (PPMs); complaint (3) is not theirs to make, but instead belongs – if to anyone – only to Primera (the company which supposedly overpaid Mr. Alfaro but has not complained about this); and complaint (4) has no merit whatsoever – even if Appellees had standing to bring it – which they don't, because Appellees are not creditors of any Appellant accused of transferring assets and no transfers rendered Primera insolvent.

During trial, Appellees did a great job pandering to the trial court's emotions, but they did not meet their ***legal burden of proof*** on the prima facie elements of any of their causes of action. Since proving each and every prima facie element of each cause of action is a

requirement for recovery, all of Appellees' claims should have been dismissed and a take-nothing judgment rendered.

For fraud (proof of which is required for Appellees' claims of common-law fraud, fraud in the inducement, and securities fraud), not only did Appellees fail to provide evidence of any false representation of fact made by any Appellant, but they all affirmatively and expressly testified to the following:

a. They all signed PPMs which contained only **_true_** factual representations and projections/estimates of future events that are unknowable and cannot support the prima facie element of "reasonable" reliance as a matter of law;

b. In their Subscription Agreements, Appellees all made representations that they **_did not_** – and they **_would not_** – rely on any statements outside of those contained in the PPMs, and if Appellees had not made those representations, they agreed they would not have been allowed to invest in the ventures;

and

c. All projections and estimates of future performance found in the PPM or spoken by Primera employees were only that: projections and estimates, not promises or assurances of future events.

Even then, if any promises were made by Appellants in the written PPMs or Subscription Agreements that were not fulfilled, that would trigger only a cause of action for breach of contract, not fraud, as

17

a matter of Texas law. But for some reason, Appellees elected not to pursue any claims for breach of contract.

Further, none of the Appellees testified that they suffered any harm proximately caused by anything Appellants are alleged to have done or not done. Indeed, even though Appellees complained that Primera mismanaged the funds they paid to purchase their working interests in the wells (i.e., Primera supposedly paid transaction-based compensation, overpaid Brian Alfaro, etc.), there was no evidence that Appellees were ever asked to pay any *additional* monies over and above their initial investments (the "budget"), other than for post-completion costs based on extraordinary events or conditions (e.g., the post-completion collar and casing failures on Screaming Eagle 3H), or regular, agreed, lease-operating expenses. If Primera had failed to drill and complete any of the wells with the money originally paid by Appellees for their working interests, then perhaps Appellees' claims would have merit. But that admittedly did not happen; all wells were drilled, and all wells with the exception of Screaming Eagle 6H and

Buda Blackhawk,[16] were completed, on budget, as set forth in the AFEs that Appellees and Primera agreed to be bound by.

In addition, Appellees testified that if there was any money left over in the budgets after the wells were drilled and completed, they understood and agreed those extra funds would become the property of Primera.[17] Since those extra funds were Primera's money, ***Appellees*** cannot complain of how those extra funds were spent. Thus, even if Primera overpaid Alfaro, or even if Primera paid transaction-based compensation to its employees (both of which are denied and contradicted by the proof in the record), no such payments proximately caused Appellees any harm. Other arguments (all without proof) about certain vendors of Primera "not being paid" are without import since there was no proof that the claims by those vendors were valid and thus should have been paid.[18]

---

[16]    Appellants were prevented from completing either of those two wells based on Appellees' State Court injunction and subsequent sale of the properties by the Trustee which action was unopposed by Appellees.

[17]    This was fully disclosed in the PPMs and thus known to any investor that chose to read them. See, e.g., PX75, p. 8786 (3H); PX76, p. 8887 (4H); PX77, p. 9026 (6H); TR 041217. p. 75.

[18]    Businessman Rick Reiley reasonably testified – twice – that if a vendor's claim was not valid, Primera was fully expected ***not*** to pay it. TR at 041117, pp. 64-65 and 138-39. None of the vendor claims have yet been adjudicated, so all are subject to contest at this time. Testimony about those claims not being "disputed" in the bankruptcy schedules was fully explained in the trial as relating only to whether the claims had documentary support, not whether they were valid and owing. See TR 041317, pp. 189-196 (misleading examination by Appellees' counsel), pp. 243-49 (testimony about actual meaning of "disputed" designation in schedules).

Appellees repeatedly testified that Alfaro spent "their money" improperly, but Appellees admitted that no money was ever given directly to Mr. Alfaro by any Appellee; all of their money was instead paid to Primera or AOG in direct exchange for working interests, and that money then became Primera's or AOG's money. That is, Appellees fail to acknowledge that once they exchanged their money for the working interests Primera and AOG sold to them (entitling them to ownership of the wells and valuable tax deductions, which all of them took), the purchase monies ceased to belong to them and instead belonged to Primera or AOG. Appellees thus lack standing to assert any payment-based claims because it was not *their* money – but Primera's and AOG's money – that was being spent. Notably, Primera and AOG are not plaintiffs in this case and have not complained about any alleged "overpayments" or other allegedly "improper" payments.

Appellees' claims are all without merit, as detailed in the Argument below, and the judgment below should be reversed and a take-nothing judgment rendered in favor of Appellants.

20

## Argument

It is important to note that this case was removed from a Texas state district court and involves only causes of action under Texas state law. Thus, under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), this Court (and the Bankruptcy Court below) must rely upon and enforce Texas State law, not federal bankruptcy law. See also *In re McCollum*, 363 B.R. 789, 792 (E.D. La. 2007)(citing *Free v. Abbott Labs, Inc.*, 176 F.3d 298 (5th Cir. 1999)) (state-law causes of action removed to bankruptcy court are adjudicated using the law of the state providing the underlying causes of action). Appellants believe the Bankruptcy Court below largely ignored this binding law in rendering its decision.

### *Standard of Review*

On appeal, a district court reviews the bankruptcy court's findings of fact under a clearly erroneous standard (i.e., deference), and its conclusions of law using *de novo* (i.e., no deference) review. *In re Babcock & Wilcox Co.*, 526 F.3d 824, 826 (5th Cir. 2008). The deference ordinarily due a lower court's fact determinations is overcome if, after reviewing the entire record, the appellate court is convinced that the lower court finding is not supported by substantial evidence, the court

21

misinterpreted the effect of the evidence, or the findings are against the preponderance of credible evidence. *Veasey v. Abbott*, 830 F.3d 216, 329 (5th Cir. 2016).

**I.    There was no evidence or insufficient evidence to support a finding of fraud, and hence all causes of action dependent on that finding are not supported in the evidence.**

### A. There is no evidence of the prima facie elements of fraud.

Each of the Appellees' claims for common law fraud, fraudulent inducement, and fraud in a real estate transaction have as their underlying elements the elements of common law fraud. Thus, if Appellees cannot prove common law fraud, they also cannot prove fraudulent inducement or fraud in a real estate transaction.

To prove common law fraud under Texas law, a plaintiff must prove (i.e., support with admissible evidence), each of the following elements:

1. The defendant made a representation of fact to the plaintiff,

2. The representation was material;

3. The representation was false:

4. When the defendant made the representation, the defendant:

    a. Knew the representation was false, or

    b. Made the representation recklessly, as a positive assertion, and without knowledge of its truth;

5. The defendant made the representation with the intent that the plaintiff would act on it;

6. The plaintiff reasonably relied on the representation and acted on it; and

7. The representation and action it induced proximately caused the plaintiff's injury.

*Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex.2015). If any element is lacking, the cause of action fails. *Id.*

A plaintiff's reliance must be both actual and justified (i.e., reasonable) before it can be said to suffer a compensable injury. *Miller Global Props, LLC v. Marriot Int'l, Inc.*, 418 S.W.3d 342, 347-48 (Tex.App.—Dallas 2013, rev. denied).

For a fraud-in-the-inducement claim, a plaintiff must prove each of these same elements, ***plus*** its "reliance" burden is heightened in that it must prove it entered into a binding agreement based on the defendant's false representation. *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex.2001). "To vitiate a contract, the alleged fraud must be something more than oral representations that conflict with the terms of the

23

written contract. ... A party that enters into a written contract while relying on a contrary oral agreement does so at its peril and is not rewarded with a claim for fraudulent inducement." *Id.* at 348; *D.R.C. Parts and Accessories, LLC v. VM Motori, S.P.A*, 112 S.W.3d 854, 859 (Tex.App.—Houston [1st Dist.] 2003, rev. denied)(*en banc*).[19]

For fraud in a real estate transaction, a plaintiff must prove all the elements of common law fraud **plus** prove that the transaction involved the purchase and sale of real property.[20]

Also applicable to our case, when the only damages or harm to a plaintiff results from breach of a duty found in a contract, the plaintiff's claim may not be "artfully" pleaded into a tort/fraud action. *Metropolitan Life Ins. Co. v. Haden & Co.*, 158 F.3d 584, 1998 WL 648603 at *6 (5th Cir. 1998)(finding statute of frauds bars fraud claim in the presence of a written contract).[21]

If Appellees are allowed a fraudulent inducement claim based on alleged statements that are directly contradicted by express language in the PPMs, it will be the first such tragic result in U.S. history. Indeed,

---

[19]    Appellants anticipate that Appellees may make the same counter-argument to this law that was made by the **dissent** in *D.R.C. Parts*. Obviously, that dissent is not the law.

[20]    In Texas, the sale of oil & gas working interests is considered a sale of real property, triggering the statute of frauds, Tex.Bus.&Comm. Code, Chapters 26 and 27. *EP Operating Co. v. MJC Energy Co.*, 883 S.W.2d 263, 266-67 (Tex.App.–Corpus Christi 1994, writ denied).

[21]    The *Met Life* case provides a good primer on many of the reasons why Appellees' fraud claims lack merit.

that result would render the doctrine of parol evidence and the statute of frauds complete nullities, portending a dangerous mutation of commercial/contract law as we know it.

The statute of frauds, Texas Business & Commerce Code §26.01, requires all material terms of most contracts (including the contracts here in question; see TB&C Code §26.01(b)(4)) to be in writing in order to be enforced. *Id*. Here, the terms Appellees rely upon for their fraud claims were not included in their written contracts and thus will not support a cause of action as a matter of law.

Because Appellees failed to prove several of the prima facie elements of a common law fraud action, all claims requiring that proof must be dismissed.

> ### B. No evidence exists that any false statements of fact were made by Appellants; indeed, every Appellee testified that all statements contained in the PPMs were (a) factually true, (b) projections of uncertain future events, or (c) sales "puffing," none of which support a claim of fraud.

All Appellees who were asked testified that all statements contained in the PPMs were factually true.[22] Thus, logically, any

---

[22]    TR 041117, pp. 136, 140-41 (Ms. Reiley); TR 041217, pp. 145-46 (Mr. Huber); p. 190 (Ms. Walls). No Appellees testified contra.

statements Appellees claim to be false must have been **verbal** statements, made by Primera employees, **outside of** the contracts, and because the law only considers statements made about issues not expressly addressed in the contract language, those statements must have been on issues **not** addressed in the PPMs.

But Appellees did not testify that any Primera employee, including Mr. Alfaro, ever verbally made any false statements of fact to them, nor any statements outside of PPM issues, nor any statements on issues not addressed in the PPMs. The only statements Appellees claim were made by Mr. Alfaro or Primera employees involved projections and estimates of future events such as how compensation paid to Primera employees would be paid and expected future production from the wells.[23]

As a matter of law, projections and estimates of future happenings will not provide the basis for a fraud claim because it is deemed unreasonable as a matter of law to rely on such statements in making investment decisions (nobody can tell the future, so reasonable people

---

[23]     TR 041217, pp. 255-56 (Mr. Rick Griffey), is a good example of this testimony. Every other witness who testified about "false statements" qualified his or her testimony by confirming that those statements were estimates or projections of future, unknown events. TR 041017, pp. 116, 162, 165; TR 041117, p. 178; TR 041217, pp. 19-20, 27, 51-52, 59-60, 130-31 (Mr. Huber candidly admits he knew he could **not** rely on such estimates which, of course, is expressly spelled out in the PPMs and thus binds all Appellees), pp. 134-35, 153.

do not rely on prognostications). *Lake v. Cravens*, 488 S.W.3d 867, 891

(Tex.App.—Fort Worth 2016, pet. pending)(case contains a good survey

of the law applicable to claims of fraud based on projections or

estimates of future events)(emphasis added):

> An actionable representation is one concerning a material ***fact***; a pure expression of opinion will not support an action for fraud. *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex.1995). "A material fact is one in which a reasonable person would attach importance to and would be induced to act on in determining their choice of actions." *Tukua Invs., LLC v. Spenst*, 413 S.W.3d 786, 798 (Tex.App.–El Paso 2013, pet. denied). "An honest but erroneous expression of opinion or belief is not fraud. ... Since a statement concerning a matter not susceptible of exact knowledge by the speaker is no more than the expression of a belief, one making such a statement ***in good faith*** is not liable for its falsity." *Harris v. Sanderson*, 178 S.W.2d 315, 319 (Tex.Civ.App.–Eastland 1944, writ ref'd w.o.m.) (emphasis in original). Whether a statement is an actionable statement of "fact" or merely one of "opinion" often depends on the circumstances in which the statement is made. *Transp. Ins. Co.*, 898 S.W.2d at 276. Relevant circumstances include the statement's specificity, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future. *Id*.

Not only did Appellees not point to any false statements of ***fact***,

but there is no evidence that anything any Primera employee ever said

was said in bad faith.

### C. No evidence exists that any representations made by Appellants were "material" as that term is defined by law.

The "materiality" element in a fraud claim is sometimes overlooked but is actually vitally important. It requires a plaintiff to prove that **a reasonable person** would attach importance to, and be induced to act on, the information in determining whether to make a transaction. *Italian Cowboy Partners v. Prudential Ins.*, 341 S.W.3d 323, 337 (Tex.2011). In *Italian Cowboy*, the Supreme Court cautioned courts to use the "reasonable man" standard rather than the self-professed materiality opinions of a biased plaintiff.

To prove fraud, the plaintiff must show the defendant knew his statements were false at the time they were made, or made them recklessly without knowledge of their truth and as positive assertions. However, Appellees in this case offered no proof of either of these required elements (knowledge or recklessness) regarding any statements made.

Not only was there no proof that Appellants intended for Appellees to rely on anything they said outside of the statements found in the PPMs, but every Appellee expressly and affirmatively stipulated

28

that they were ***not*** relying on any such statements in making their investment decisions ***and*** the PPMs themselves confirm this understanding.[24] This is conclusive evidence that Appellants intended ***exactly the opposite*** of what Appellees are required to prove: Appellants intended that Appellees would ***not*** rely on any such non-contract statements, made them promise they would not do so, and contractually prohibited them from doing so.

Texas law is clear: contract provisions in which plaintiffs stipulate that they will not, and have not, relied on statements outside those written in a contract are enforceable and preclude any claim for fraud or fraudulent inducement. This is known from controlling Texas law:

> "[A] disclaimer of reliance on representations, 'where the parties' intent is clear and specific, should be effective to negate the element of reliance.'" *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 (Tex.2008) (quoting *Schlumberger*, 959 S.W.2d at 179). "[P]arties who contractually promise not to rely on extra-contractual statements—***more than that, promise that they have in fact not relied upon such statements***—should be held to their word." *Forest Oil*, 268 S.W.3d at 60 (emphasis in orig.). When knowledgeable parties expressly discuss

---

[24]     All of the Subscription Agreements signed by the Appellees contained identical or substantively-similar language, and all witnesses who were asked confirmed they knew they could not rely on extra-PPM information in deciding to invest. See DX7, p. 6260 (M1H); DX9, p. 6285 (M2H); DX10, p. 6296 (SE2H); DX14, p. 6345(SE3H); DX16, p. 6369 (SE4H); DX15, p. 6359 (SE6H); DX 33, p. 6522 (BUDA).

material issues during contract negotiations, but nevertheless elect to include a waiver-of-reliance provision, courts will generally uphold the contract. See *id.* at 58. An all-embracing disclaimer of any and all representations shows the parties' clear intent. *Id.* However, "facts may exist where the disclaimer lacks 'the requisite clear and unequivocal expression of intent necessary to disclaim reliance' on the specific representations at issue." *Id.* at 60 (quoting *Schlumberger*, 959 S.W.2d at 181). As a result, when determining whether a waiver-of-reliance provision is binding, courts must always examine the contract itself and the totality of the surrounding circumstances, including whether: (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties discussed the issue which has become the topic of the dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear. *See Forest Oil*, 268 S.W.3d at 60. "If disclaimers of reliance cannot ensure finality and preclude post-deal claims for fraudulent inducement, then freedom of contract, even among the most knowledgeable parties[, who were] advised by the most knowledgeable legal counsel, is grievously impaired." *Id.* at 61.

*Worldwide Asset Purchasing, LLC v. Rent-A-Center East, Inc.*, 290 S.W.3d 554, 566 (Tex.App.—Dallas 2009, no pet). If this were not the law, written contracts would be meaningless, which would cause all of the world's business to grind to a screeching halt and open the courts to

all sorts of he said-she said, after-the-fact, self-serving, and nefarious assertions – just like we have here!

The non-reliance provision signed by Appellees could not be more clear (this paragraph is representations made by investors):

> **m.**  I have relied solely on the information contained in the Confidential Private Placement Memorandum and the attachments thereto furnished to me by the Company, and further, I hereby warrant that no representations or warranties have been made to me by the Company of its agents as to the tax consequences of this investment, or as to any profits, losses or cash flow which may be received or sustained as a result of this investment, other than those contained in the Confidential Private Placement Memorandum. My decision to invest in the Program has been based solely upon the information found within the Confidential Private Placement Memorandum and not upon oral statements by the Company, its agents or employees;[25]

Further, Appellees testified that they were able to ask questions about the PPMs and in fact did ask questions relating to both the "transaction based compensation" and the use-of-funds issues, and then chose to execute the waiver provisions asserting that they made their investment decisions without relying on these discussions.

> **e.**  I have had the opportunity to ask questions of, and receive answers to those questions from officers

---

[25]    DX15, p. 6359.

> and employees of the Company, concerning the
> terms and conditions of the Program, and the
> proposed business of the Company, and that all such
> questions have been answered to my full
> satisfaction.[26]

Even more, when the parties to the contract are sophisticated, "accredited" investors in oil & gas ventures, such non-reliance provisions are fully enforceable and preclude later claims based on alleged reliance that has been disclaimed:

> When knowledgeable parties expressly discuss
> material issues during contract negotiations, but
> nevertheless elect to include a waiver-of-reliance
> provision, courts will generally uphold the
> contract.

*Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 58 (Tex.2008).

Here, Appellees warranted in their Subscription Agreements that they are "accredited" investors, meaning they have a level of financial wherewithal and sophistication to understand these investments, which must include understanding the relevant documents:

> **n.** I have knowledge and experience in financial
> and business matters and am capable of
> evaluating the merits and risks of an investment
> in the Program, and am able to bear the economic
> risks of my purchase, and, furthermore, I have
> had the opportunity to consult with my own

---

[26]   DX15, p. 6358.

32

> attorney, accountant and/or purchaser representative regarding an investment in the Program[27]

To allow Appellees to make the representations and warranties they would not rely on outside statements in order to be allowed to make these investments and obtain the benefits therefrom (revenues, tax deductions, etc.), but then disclaim those same representations and warranties when it suits them to do so, is inherently unjust and contrary to Texas law.

Even if Appellees reasonably relied on non-contractual statements made by Appellants (which they couldn't, as a matter of law and their agreement), and even if Appellants were shown to have intended such reliance (which is the opposite of what happened), any such reliance has not been proven to have harmed Appellees in any way.

Appellees claim they "relied" on statements made by Appellants not to pay transaction-based compensation to salesmen, and that Primera would use all invested funds to drill and complete the wells. But as shown above, claims related to paying transaction-based compensation could not have impacted the decision to invest because all

---

[27]      DX 15, p. 6359. This representation was in addition to the entirety of the Subscription Agreements, wherein Appellees all certified their suitability for the investment.

such compensation was paid, if at all, only from Primera's assets and not from Appellees' funds and long ***after*** the investments were made, and Primera ***did*** use the invested funds to drill and complete the wells; Appellees were never asked for any monies over the budget and LOEs for any purpose, so their understanding of what would become of the purchase money they invested (drill and complete the wells, with any extra going to Primera to do with as it pleased) was 100% fulfilled.[28] In addition, Appellees testified that if there was any money left over in the budgets after the wells were drilled and completed, they understood and agreed that those extra funds would become the property of Primera.[29]

Here, the two alleged factual representations that Appellees claim support their fraud claims are that Primera would not pay transaction-based compensation to its salesmen, and that Primera would only use the invested funds to drill and complete the wells and not to otherwise benefit Primera. Taking these one at a time reveals their lack of merit and immateriality to a reasonable man.

---

[28]      Are Appellees seriously arguing that they somehow maintained some sort of control over what Primera did with monies they agreed would belong to Primera? No buyer of any product believes it may dictate to the seller what becomes of the purchase-price money once it is paid and the transaction is completed. As absurd as it sounds, that appears to be Appellees' entire argument here.

[29]      This was fully disclosed in the PPMs and thus known to any investor that chose to read them. See, e.g., PX75, p. 8786 (3H); PX76, p. 8887 (4H); PX77, p. 9026 (6H); TR 041217. p. 75.

### D. Appellees provided no proof of negligent misrepresentation.

The elements of a negligent misrepresentation claim are:

    a. The defendant made a representation to the plaintiff in the course of the defendant's business or in a transaction in which the defendant had an interest;

    b. The defendant supplied false information for the guidance of others;

    c. The defendant did not exercise reasonable care or competence in obtaining or communicating the information;

    d. The plaintiff justifiably relied on the representation; and

    e. The defendant's negligent misrepresentation proximately caused the plaintiff's injury.

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex.1999). Here, Appellees have not provided any evidence that the statements they claim were made to them were made "for their guidance" or that they justifiably relied on those statements before investing.

The "independent injury" rule applies in negligent misrepresentation claims. *Plano Surgery Center. v. New You Weight Mgmt. Ctr.*, 265 S.W.3d 496, 503 (Tex.App.—Dallas 2008, no pet.). That rule provides that if the plaintiff's losses are calculated from the terms of a contract breach, then they are not "independent" and may not be recovered in tort. Since Appellees did not allege and did not prove an independent injury, they may not recover for negligent misrepresentation.

Further, a plaintiff may not recover benefit-of-the-bargain damages for negligent misrepresentation, but rather only out-of-pocket (or extraneous) damages. *D.S.A., Inc. v. Hillsboro ISD*, 973 S.W.2d 662, 663-64 (Tex.1998). Here, Appellees are not asserting any claims for out-of-pocket damages, so their negligent misrepresentation claim is legally invalid on that basis as well.

## II.   *There is no evidence that any "commissions" were paid to Primera employees or that funds were ever used other than exactly as represented.*

Appellees' selective "cherry picking" of the actual compensation data borders on fraud on the Court. Appellees claimed that "over 100 times" during a three-year period Primera paid compensation or draws

to its employees that were at or near 10%. This argument was apparently bought hook, line, and sinker by the trial court.[30] But the truth is far different.

Actually, during the subject 18-month period (January 2, 2013 to June 23, 2014), over 1,150 individual investor deposits were made. Of those, there were less than 80 compensation and draw/bonus payments made that were within plus or minus 1% of 10%. That means over 1,000 investor deposits were made where there was either no corresponding payment/draw made *at all*, or the payments/draws were for an amount nowhere near 10%. All Appellees' "10% numbers" prove is that someone can cherry pick any data to support any claim they care to make – as long as they are not too interested in telling the whole truth.

### a. Raw timing of salaries is not supportive of a "commission" salary arrangement.

It makes perfect sense that the salesforce would be paid their salaries *after* investor monies hit Primera's bank account because those funds were Primera's main source of revenue to pay *all* of its expenses,

---

[30]   If Appellees' argument were valid, we would see a 10% commission paid for each and every transaction Primera engaged in during the entire time it was selling interests in the wells. But of course, that is not what we see; we only see carefully-selected and coincidental 10% numbers for a very small percentage of the revenues generated over the course of the three years at issue.

including the salaries of its employees. But the way in which Primera calculated those salaries and bonuses is not material.

The onus of "transaction based compensation" is not about how the salesmen were paid, but whether such commissions are paid *in addition to* the amount being invested by investors.[31] That is, if a reasonable investor paid $100,000 for his percentage working interest, as long as he was not then tagged *another* 10% on top of that for "sales commissions," why does he care how Primera *calculated* the compensation of its salesmen (percentage, hourly, weekly, bi-weekly, monthly, salary, bonuses, etc.)? An ordinary, reasonable investor is only interested in what he pays *in total* and what he gets in return, and as long as money he parts with is used for its intended purposes – as it was here – other accounting details are completely immaterial.

Not to be forgotten, Appellees admit that all funds in the budgets that were not used to pay for the expenses of drilling and completion became the property of Primera, even if the AFEs did not have a separate line item for those monies. Accordingly, all of those funds could

---

[31]     In other words, true commissions are defined as the amount paid to a salesman that does not translate into the value of the investment. For instance, if I buy a $100,000 investment and pay a 10% commission, I am actually required to pay the seller a total of $110,000, of which $100,000 is for the investment and the other $10,000 is the commission. There is no evidence that any such transactions occurred with Primera.

be spent by Primera as it deemed fit ***because any such expenditures did not impact Appellees in any way, financially or otherwise***. An accounting detail that does not financially impact a reasonable investor is, by definition, not "material."[32]

Also, ***true*** commissions are compensation earned as soon as the income is received, and they are a binding contractual obligation of the company to pay to the salesman.[33] Here, there is zero testimony that the salaries or bonuses paid to Primera employees were obligations of the company or tied solely to sales. Indeed, the undisputed evidence in the case is that all salaries and bonuses were discretionary and based on many factors other than the amount of money the salesmen raised for the company.[34] Mr. Alfaro, the person at Primera who approved all salaries[35] and bonuses, was clear that there were a whole range of

---

[32]    It is obvious that all claims related to "commissions" were made by Appellees only to insinuate that Mr. Alfaro violated securities law in paying commissions without a broker license, and that such arguments have nothing to do with the merits of Appellees' claims but were made only to scare Mr. Alfaro into settlement. Indeed, this insinuation is the only reason Appellees brought up the default FINRA ruling in the first place. To be confused about this is to be confused about the quintessential truth of this entire case: it is and always was a shakedown.

[33]    See TR 041317, pp. 215 and 261, where a CPA – called as a witness by the Appellees – explains what "commissions" really are, and that they were ***not*** paid in this case. See also TR 041317, p. 162, where salesman Hundley denies commissions were paid. In fact, no Primera salesman testified he was ever promised, or paid, commissions.

[34]    TR 041317, p. 175; TR 041717, pp. 167-68 (indeed, some of the paperwork showing bonuses was inaccurate as to what was actually paid out), 173; TR 041817, pp. 20-21, 57.

[35]    Appellees conveniently leave out of their calculus the undisputed fact that Primera salesmen were paid ***salaries*** in addition to (maybe) discretionary bonuses. Would a rational commission salesman ever agree to such an arrangement, where he received his "commissions" for sales he makes on a ***discretionary***, as opposed to a fixed and binding, basis? Similarly, would a salary-only salesman ever agree to an arrangement where payment of his salary was purely ***discretionary***? These questions answer themselves.

factors that went into his decisions on bonuses, and none of those factors were tied directly to the dollar amounts of sales made.[36] Instead, they were based – as are all such discretionary bonuses – not only on sales but on other factors such as client development, help with marketing, help with training, public/community service, charity, client servicing, and professional growth by the salesmen.[37]

### b. The evidence all shows Primera used investor funds exactly as represented.

Appellees contend that Primera represented it would use AFE funds identified in the PPMs to drill and complete the wells. But Primera did exactly that and there is no proof otherwise. Appellees were not charged any additional monies for standard drilling and completion expenses that were not outlined and agreed to in the AFE budgets and they were not charged sales commissions. Thus, even if a reasonable investor would expect Primera to honor its promise to use

---

[36]     Obviously, since Primera's main source of revenue was from investors buying shares in the wells, Primera's monies were not available to spend on **anything** until after the investors paid for their working interests. But that is a far cry from saying there is a one-to-one correlation between investor payments and the monies paid to Primera salesmen, and all of the actual evidence in the case proves that such commissions were **not** paid.

[37]     TR 041817, pp. 20-21. This testimony was uncontroverted, even though Appellees put three different Primera salesmen (Hundley, Rodriguez, and Alfaro) and two of its accounting personnel (Perez and Turner) on the stand. Since Appellees and Appellees' counsel were not employed by Primera, their guesses about how the compensation was calculated and paid are just that: guesses, and guesses are "no evidence" as a matter of law. *See Henderson v. Wal-Mart Stores, Inc.*, 2015 WL 970673 at *5 (E.D. Tex. 2015)("Evidence so slight that any inference is purely a guess is no evidence at all"); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.2004)(same).

invested funds to drill and complete the wells, ***that is exactly what happened.***[38]

### c. Even if statements or promises exist in the PPMs that Primera or AOG did not fulfill, that would only be actionable as a breach of contract under Texas law, not fraud, and Appellees chose not to bring a breach of contract claim.

Under Texas law, if a promise is made in a contract, and the action promised is not a duty otherwise found in common law, then a breach of that promise will only support a cause of action for breach of contract, not tort/fraud.[39] Even if Appellees showed transaction-based compensation, that would only be a breach of contract.

Here, the promise not to pay transaction-based compensation is not a duty found in common law but rather only in the contracts at

---

[38]     Let's say a well's budget was $10,000,000. If it cost only $9,000,000 to drill that well, the remaining $1,000,000 belonged to Primera. So whether Primera paid its employees part of the $1,000,000 on a percentage or hourly or weekly or monthly basis, what possible difference could that make to a reasonable investor? The investors paid $10,000,000 either way, and they were not entitled to return of any funds *below* that $10,000,000 number, so why do they care (i.e., why is it "material")?

[39]     While some courts describe the law of contorts as "a muddy area, devoid of bright line rules" (*Total E & P USA, Inc. v. Mo-Vac Service Co., Inc.*, 2012 WL 3612505 (Tex.App.—Corpus Christi 2012)), the law is crystal clear in the context of *this* case: if the only injury to the plaintiff is the economic loss arising from the subject matter of the contract in a commercial context, and if the duty is found only in the contract and not in common law, then the action sounds only in contract, not in tort. *SW Bell Tele. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex.1991). This is known as the "economic loss rule." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998). "[M]ere nonfeasance under a contract creates liability only for breach of contract." *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 213 (Tex.1996).

     Because Appellees have not alleged damages or harm over and above the value of the contracts they signed, they do not qualify to bring a fraudulent inducement claim under *Formosa*. That is, fraudulent inducement is not merely a plaintiff alleging that he was told something that was not true before entering into a contract; the claim also requires proof of harm or damages separate from, and in addition to, the loss occasioned by the defendant's contract breach. *Crawford*, 917 S.W.2d at 13. If the only harm alleged is benefit of the bargain, as it is here, then plaintiff is limited to a breach of contract claim; this is known as the "independent injury" doctrine. *D.S.A, Inc. v. Hillsboro ISD*, 973 S.W.2d 662, 663-64 (Tex.1998, *per curiam*).

issue. Thus, if Primera paid such compensation, it would only support a cause of action for breach of contract, not fraud, negligence, or any other common law tort. But Appellees decided not to bring a breach-of-contract claim, so they should take nothing even if such compensation was paid, which it wasn't.

Additionally, the only loss Appellees assert was to the economic value of the subject contract, and thus the economic loss and independent injury rules limits Appellees' cause of action to one for breach of contract. *ConocoPhillips Co. v. Koopman*, 2016 WL 2967689 at *15-16 (Tex.App.—Corpus Christi 2016, no pet.). Appellees' fraud claims thus fail as a matter of law and the judgment below should be reversed.

### III. *The bankruptcy court erred when it found a violation of the Texas Uniform Fraudulent Transfer Act because Appellees did not prove the prima facie elements needed to support that finding.*

Under the Texas Uniform Fraudulent Transfer Act or TUFTA (Texas Business & Commerce Code, §24.001, et seq.), a transfer made by an insolvent (or made insolvent) debtor with the actual or constructive intent to defraud any creditor may be avoided to the extent necessary to satisfy the creditor's claims. *Janvey v. Golf Channel, Inc.*,

487 S.W.3d 560, 562 (Tex.2016). Thus, only creditors of the defendant have standing to bring a TUFTA claim. Texas Business & Commerce (TB&C) Code §24.008.

Appellees cannot show they were "creditors" of any of the Appellants.[40] To be a creditor, a person must be owed a debt. What debt do the Appellees claim was owed to them? And by whom? The answers are "nothing" and "no one."

Creditors are defined as those who have a monetary claim against the defendant, a claim being defined as a "right to payment or property." TB&C Code §24.002(3) and (4). Because only creditors have standing to bring a TUFTA claim, and because Appellees are not creditors, their TUFTA claims should have been dismissed for lack of standing. *Hoffman v. AmericaHomekey, Inc.*, 2015 WL 12698389 at *2 (N.D. Tex. 2015)("As the language of the UFTA makes evident, '[o]nly creditors have standing under the UFTA to seek relief from a fraudulent transfer or obligation'")(citing *Davis v. J.P. Morgan Chase Bank, N.A.*, 2014 WL 2854671 at *4 (N.D. Tex. 2014)). Having an

---

[40]       Appellees could potentially (albeit spuriously) argue that they were creditors of **Primera**, however, they have their judgment against Primera (Docket No. 202) and that judgment is not the subject of this appeal.

unproven cause of action for unliquidated alleged damages against a party/defendant not yet brought in a lawsuit does not a creditor make.

In addition to proving standing as "creditors" (which Appellees cannot do), the elements of a TUFTA claim a plaintiff must plead and prove, and which Appellees failed to plead and prove, are:

1. The defendant is "insolvent" when the transfer is made or the transfer renders the defendant insolvent;

2. The defendant made a transfer of property without receiving reasonably equivalent value;

3. Defendant had the intent to hinder, delay, or defraud his creditors;

4. The plaintiff is a current creditor of the defendant when the transfer is made or became a creditor within a reasonably short time after the transfer is made; and

5. The defendant engaged in or was about to engage in a business or a transaction for which his remaining assets were unreasonably small in relation to the business or transaction, or intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Here, even if we concede standing (which we do not), Appellees submitted zero evidence on any of the *other* five prima facie elements of a TUFTA claim.

First, none of the Appellees were creditors of any of the Appellants, ever. Indeed, through the date of this brief, none of the Appellees are creditors of any of the Appellants, and all of the subject transfers were made many, many years ago. Appellees thus lack standing to make this claim.

Second, the "transfers" Appellees point to are set out in the Pretrial Order, p. 3, "Plaintiffs' Contentions":

> Mr. Alfaro, individually and as the sole member of Alfaro Oil & Gas, LLC and Alfaro Energy, LLC transferred investor moneys (sic) to Defendants 430 Assets LLC to purchase a Lamborghini and Range Rover, to SilverStar (sic) Resources to purchase an oil and gas asset in Montague County, to Alfaro Energy LLC to pay for expenses related to other offerings, to Kristi Alfaro and to the Brian and Kristi Alfaro Living Trust to purchase real estate and pay mortgages, taxes and expenses on such real estate, and upon information and belief, to King Minerals LLC and Ana & Avery's Candy Island LLC to shield investors from getting their investments back.

Note: in the case-controlling Pretrial Order, Appellees are not alleging that ***Primera*** was the transferring entity, either itself or by its

45

agent Brian Alfaro; only AOG and Alfaro Energy are named as transferring entities and as the corporate entities through which Mr. Alfaro was acting. Therefore, any transfers made by Primera or Alfaro are not at issue in this case.[41]

Then, even if we include Primera as a "transferring entity," Appellees never identify what "investor monies" were allegedly transferred. It is undisputed that once Appellees paid for and received their working interests, the funds used to purchase those working interests no longer belonged to them, and thus cannot be deemed "investor monies" after that point.[42]   That is, those funds were ***not*** being held "in trust" for Appellees; Appellees admittedly received the intended quid pro quo for their funds. After those sales, the purchase funds belonged to Primera or AOG. Therefore, Appellees did not show how "their money" was transferred anywhere other than as they

---

[41]     Appellees make vague allegations of Mr. Alfaro's connection with the other Appellant entities, then assert that Alfaro was the "alter ego" of those entities. Pretrial Order, p. 1-2. This is nonsensical: corporations are the alter egos of individuals, not the other way around. Even then, Appellees never pleaded nor sought an alter ego finding of any kind.
        Further, Appellees claim that the Appellants received "fraudulent funds," but that term is unknown to the law. Pretrial Order, p. 2. It is thus not entirely clear what Appellees are actually asserting here.
[42]     If Appellees would like to admit to federal tax fraud, they may certainly do so. But they have all represented to the IRS in their tax filings that they owned the working interests they purchased, or else they would not have been allowed to take the tax deductions which that ownership allowed. This means they either lied to the IRS about their ownership status, or they are lying to this Court that the funds they gave to Primera and AOG are still "their money." Appellees cannot have it both ways.

intended: to Primera or AOG in exchange for working interests in the wells at agreed values.

Finally, there is no evidence in this record that transfers made by AOG or Alfaro Energy were made at a time when those entities were insolvent or that they were rendered insolvent by any transfer; there is no evidence that any of the Appellants transferred any funds for the purpose of delaying, hindering, or defrauding any of their creditors; and there is no evidence that any transfer was made for anything other than reasonably equivalent value.

Because Appellees cannot prove even a single element of a TUFTA claim – much less *every* element – all such claims should have been dismissed. The trial court erred in not doing so.

## Conclusion and Prayer

Appellants have shown that the actual facts of the case do not support any of Appellees' causes of action as a matter of law. The entry of judgment based on such facts and findings is therefore legal error that must be corrected by this Court.

Appellants thus pray for reversal of the judgment below, and the rendering of a take-nothing judgment in favor of Appellants against all Appellees on all claims and causes of action.

Appellants also pray for such other and further relief as is just.

RESPECTFULLY SUBMITTED:

By: /s/ James A. Pikl
Texas Bar No. 16008850
jim.pikl@solidcounsel.com
Patrick J. Schurr
Texas Bar No. 17853530
patrick.schurr@solidcounsel.com
SCHEEF & STONE, L.L.P.
2600 Network Boulevard
Suite 400
Frisco, Texas 75034
(214) 472-2100
Fax: (214) 472-2150

**ATTORNEYS FOR THE APPELLANTS**

## Certificate of Compliance – FRAP 32(g)(1)

This brief complies with the rule because it contains _____9,102_____ (13,000 max) words, and is written in Century Schoolbook, 14-point font.

/s/ James A. Pikl

**Certificate of Service**

I hereby certify that on June 12, 2018, a true and correct copy of Appellants' Brief was served on the following counsel by email attachment and by ECF filing:

Brandon M. Barchus
Faulk Barchus PLLC
bbarchus@faulkbarchus.com

Lawrence Morales II
The Morales Firm P.C.
Lawrence@themoralesfirm.com

/s/ Patrick J. Schurr